# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AK STEEL CORPORATION
 9227 Centre Point Drive
 West Chester, OH  45069;

CF INDUSTRIES, INC.
 4 Parkway North, Suite 400
 Deerfield, IL  60015;

DAIRYLAND POWER COOPERATIVE
 3200 East Avenue, S.
 La Crosse, WI  54602;

DYNO NOBEL, INC.
 5 East Cottonwood Parkway, Suite 500
 Salt Lake City, UT  84121;

ENTERGY ARKANSAS, LLC
 425 West Capitol Avenue
 Little Rock, AR  72201;

ENTERGY LOUISIANA, LLC
 4809 Jefferson Highway
 Jefferson, LA  70121;

EXELON GENERATION COMPANY, LLC
 300 Exelon Way
 Kennett Square, PA  19348;

NORTH STAR BLUESCOPE STEEL LLC
 6767 County Road 9
 Delta, OH  43515;

STEELSCAPE, LLC
 222 West Kalama River Road
 Kalama, WA  98625;

 *and*

Case No. 1:19-cv-02970-PLF

**UNION PACIFIC RAILROAD COMPANY'S ANSWER TO PLAINTIFFS' COMPLAINT**

**JURY TRIAL DEMANDED**

WISCONSIN ELECTRIC POWER COMPANY
D/B/A WE ENERGIES
231 W. Michigan Street
Milwaukee, WI 53203,

*Plaintiffs,*

v.

BNSF RAILWAY COMPANY
2650 Lou Menk Drive
Fort Worth, TX 76131;

CSX TRANSPORTATION, INC.
500 Water Street
Jacksonville, FL 32202;

NORFOLK SOUTHERN RAILWAY
COMPANY
Three Commercial Place
Norfolk, VA 23510;

*and*

UNION PACIFIC RAILROAD COMPANY
1400 Douglas Street
Omaha, NE 68179,

*Defendants.*

## UNION PACIFIC'S ANSWER TO COMPLAINT

Defendant Union Pacific Railroad Company ("UP"), for itself only, answers the

Complaint ("Complaint") of Plaintiffs AK Steel Corporation ("AK Steel"), CF Industries, Inc.

("CF Industries"), Dairyland Power Cooperative ("Dairyland"), Dyno Nobel, Inc. ("Dyno

Nobel"), Entergy Arkansas, LLC ("Entergy Arkansas"), Entergy Louisiana, LLC ("Entergy

Louisiana"), Exelon Generation Company, LLC ("Exelon"), North Star BlueScope Steel LLC

("North Star"), Steelscape, LLC ("Steelscape"), and Wisconsin Electric Power Company, d/b/a

We Energies ("WEPCO") (collectively, "Plaintiffs"), as set forth below. UP denies each and

every allegation of the Complaint, except as specifically stated, and denies that it violated in any way the antitrust laws under which Plaintiffs purport to bring this action.

**Introduction**

1.      UP denies the allegations in this paragraph.

2.      UP admits that it collected fuel surcharges from certain customers as a cost-recovery mechanism.  UP denies the remaining allegations in this paragraph.

3.      UP admits that in late 2002 it announced a carload fuel surcharge based upon the West Texas Intermediate ("WTI") index, and that in 2003 it announced a carload fuel surcharge based upon the Retail On-Highway Diesel Fuel ("HDF") index.  UP denies the remaining allegations in this paragraph.

4.      UP admits that the Staggers Rail Act of 1980 partially deregulated the railroad industry.  UP denies the remaining allegations in this paragraph.

5.      UP admits that both before and after 2003 it collected fuel surcharges from certain customers as a cost-recovery mechanism.  UP denies the remaining allegations in this paragraph.

6.      UP admits that the All-Inclusive Index ("AII") and the Rail Cost Adjustment Factor ("RCAF") were indices published by the Association of American Railroads ("AAR"), a railroad trade association, that weighted a variety of cost factors.  UP admits that it entered into private freight transportation contracts, some of which included rate escalation provisions tied to various cost indices.  UP denies that the RCAF or the AII captured its actual increases in fuel costs.  UP denies the remaining allegations in this paragraph.

7.      UP denies the allegations in this paragraph.

8.      UP lacks sufficient information to form a belief about the truth of the allegations in this paragraph concerning alleged statements by BNSF's Chairman, President, and CEO, and on that basis denies them.  UP denies the remaining allegations in this paragraph.

9.      UP admits that in late 2002 it announced a carload fuel surcharge based upon the WTI index, and that in 2003 it announced a carload fuel surcharge based upon the HDF index. UP admits that prior to 2003 BNSF had fuel surcharges that were based on the HDF index.  UP admits that Mr. Young made the statements quoted in this paragraph during an October 2004 earnings conference call, at which time he was President of UP.  During that same earnings call, Mr. Young explained that UP uses fuel surcharges "to neutralize the volatility of fuel prices."   UP admits that Mr. Young was interviewed in 2007.  Any document referring to or purporting to transcribe statements made during that interview speaks for itself and UP denies any allegations inconsistent with such document or transcription.  UP denies the remaining allegations of this paragraph.

10.      UP lacks sufficient information to form a belief about the truth of the allegations in this paragraph concerning other Defendants' alleged statements, conduct, or documents, and on that basis denies them.  UP denies the remaining allegations in this paragraph.

11.      UP admits that UP had a variety of fuel surcharges that were calculated as a percentage of UP's rate for freight transportation.  UP admits that the other Defendants publicly announced various surcharges that were calculated as a percentage of their rates for freight transportation.  In the 1970s, the Interstate Commerce Commission ("ICC"), which was the predecessor of the Surface Transportation Board ("STB"), determined that a rate-based mechanism to capture fuel costs was appropriate, rejecting a request by certain shippers that the

railroads utilize a mileage-based mechanism.  UP denies the remaining allegations of this paragraph.

12.     UP denies the allegations in this paragraph.

13.     UP denies the allegations in this paragraph.

14.     UP denies the allegations in this paragraph.

15.     UP admits that the STB issued a ruling in January 2007 directed to rate-based rail fuel surcharges related to regulated traffic.  UP asserts that the ruling speaks for itself and on that basis denies Plaintiffs' characterization of the ruling, which is inappropriate for a complaint and should be stricken.  UP denies the remaining allegations in this paragraph.

16.     UP admits that this Court has issued several rulings in the *In re Rail Freight Fuel Surcharge Antitrust Litigation*, MDL No. 1869.  UP asserts that the rulings speak for themselves and on that basis denies Plaintiffs' characterization of the rulings.

17.     UP admits that this Court has issued several rulings in the *In re Rail Freight Fuel Surcharge Antitrust Litigation*, MDL No. 1869.  UP asserts that the rulings speak for themselves and on that basis denies Plaintiffs' characterization of the rulings.

18.     UP denies the allegations in this paragraph.

19.     UP denies the allegations in this paragraph.

20.     UP denies the allegations in this paragraph.  UP independently and unilaterally determined what fuel surcharges to adopt, and at no time did it enter into an agreement or conspiracy with railroads to implement the same fuel surcharge program in violation of the antitrust law.

## **Parties**

### **Plaintiffs**

21.     UP lacks sufficient information to form a belief about the truth of the allegations concerning AK Steel's corporate status, residence, and business.  UP admits that AK Steel purchased certain rail transportation services from UP during the relevant time period.  UP denies the remaining allegations in this paragraph.

22.     UP lacks sufficient information to form a belief about the truth of the allegations concerning CF Industries's corporate status, residence, and business.  UP admits that CF Industries or its subsidiaries purchased certain rail transportation services from UP during the relevant time period.  UP denies the remaining allegations in this paragraph.

23.     UP lacks sufficient information to form a belief about the truth of the allegations concerning Dairyland's corporate status, residence, and business.  UP admits that Dairyland purchased certain rail transportation services from UP during the relevant time period.  UP denies the remaining allegations in this paragraph.

24.     UP lacks sufficient information to form a belief about the truth of the allegations concerning Dyno Nobel's corporate status, residence, and business.  UP admits that Dyno Nobel purchased certain rail transportation services from UP during the relevant time period.  UP denies the remaining allegations in this paragraph.

25.     UP lacks sufficient information to form a belief about the truth of the allegations concerning Entergy Arkansas's corporate status, residence, and business.  UP admits that Entergy Arkansas purchased certain rail transportation services from UP during the relevant time period.  UP denies the remaining allegations in this paragraph.

26.     UP lacks sufficient information to form a belief about the truth of the allegations concerning Entergy Louisiana's corporate status, residence, and business.  UP admits that Entergy Louisiana purchased certain rail transportation services from UP during the relevant time period.  UP denies the remaining allegations in this paragraph.

27.     UP lacks sufficient information to form a belief about the truth of the allegations concerning Exelon's corporate status, residence, and business.  UP admits that Exelon purchased certain rail transportation services from UP during the relevant time period.  UP denies the remaining allegations in this paragraph.

28.     UP lacks sufficient information to form a belief about the truth of the allegations concerning North Star's corporate status, residence, and business.  UP admits that North Star purchased certain rail transportation services from UP during the relevant time period.  UP denies the remaining allegations in this paragraph.

29.     UP lacks sufficient information to form a belief about the truth of the allegations concerning Steelscape's corporate status, residence, and business.  UP admits that Steelscape purchased certain rail transportation services from UP during the relevant time period.  UP denies the remaining allegations in this paragraph.

30.     UP lacks sufficient information to form a belief about the truth of the allegations concerning WEPCO's corporate status, residence, and business.  UP admits that WEPCO purchased certain rail transportation services from UP during the relevant time period.  UP denies the remaining allegations in this paragraph.

**Defendants**

31.    UP admits that CSX is a major freight railroad with railway lines in the eastern United States.  Based on a review of public filings, CSX's principal executive offices are located at 500 Water Street, 15th Floor, Jacksonville, FL 32202.  UP lacks sufficient information to form a belief about the truth of the remaining allegations in this paragraph.

32.    UP admits that NS is a major freight railroad with railway lines in the eastern United States.  Based on a review of public filings, NS's principal executive offices are located at Three Commercial Place Norfolk, Virginia 23510.  UP lacks sufficient information to form a belief about the truth of the remaining allegations in this paragraph.

33.    UP admits that BNSF is a major freight railroad with railway lines in the western United States.  Based on a review of public filings, BNSF's principal executive office is located at 2650 Lou Menk Drive, Fort Worth, Texas 76131.  UP lacks sufficient information to form a belief about the truth of the remaining allegations in this paragraph.

34.    UP admits the allegations in this paragraph.

**Jurisdiction and Venue**

35.    The statement regarding jurisdiction is a legal conclusion for which no response is necessary.  To the extent a response is deemed required, UP denies the allegations in this paragraph.

36.    This paragraph states a legal conclusion for which no response is necessary.  To the extent a response is deemed required, UP denies the allegations in this paragraph.

37.    UP does not contest personal jurisdiction in this case.  UP denies all remaining allegations in this paragraph.

**Factual Background**

## I.   [ALLEGEDLY] CONGRESS ENACTED THE STAGGERS ACT TO FOSTER COMPETITION IN THE RAIL INDUSTRY, BUT CONSOLIDATION INCREASED OPPORTUNITIES FOR COLLUSION

38.      UP denies the heading that appears before this paragraph.  UP admits that, prior to the Staggers Act, railroads generally charged rates established in published tariffs filed with the ICC.  UP denies the remaining allegations in this paragraph.

39.      UP admits that, prior to the Staggers Act, railroads generally charged rates established in published tariffs filed with the ICC.  UP denies the remaining allegations in this paragraph.

40.      UP admits that the Staggers Rail Act of 1980 partially deregulated the railroad industry.  UP admits that, prior to the Staggers Act, railroads generally charged rates established in published tariffs filed with the ICC.  UP denies the remaining allegations in this paragraph.

41.      UP admits that the House Committee Report for the Staggers Act contains the language quoted in this paragraph.  UP denies Plaintiffs' characterization of that document and the allegations in this paragraph.

42.      UP lacks sufficient information to form a belief about the truth of the allegation that at least 80 percent of all rail shipments were subject to private contracts, or are otherwise not rate-regulated, and on that basis denies it.  UP denies the remaining allegations in this paragraph.

43.      UP admits that there are now seven Class I railroads in the United States as Plaintiffs define the term.  UP lacks sufficient information to form a belief about the truth of the allegations in this paragraph concerning other Defendants' percentage of track operation and revenues and on that basis denies them. UP denies the remaining allegations in this paragraph.

44.      UP admits that the STB imposed a temporary moratorium on mergers of Class I railroads in response to the proposed merger of Burlington Northern Santa Fe and Canadian

National Railway and promulgated new standards for approving mergers.  UP also admits that it experienced increasing demand for its services in the 2000s.  UP lacks sufficient information to form a belief about the truth of the allegations concerning the demand and capacity of other railroads.  UP denies the remaining allegations of this paragraph.

45.     UP lacks sufficient information to form a belief about the truth of allegations concerning other railroads.  UP denies the remaining allegations of this paragraph.

## II.     IMPLEMENTATION OF THE [ALLEGED] SCHEME: [ALLEGEDLY] THE DEFENDANTS CONSPIRE TO DEPART FROM PAST PRACTICE AND CHANGE THE INDEXES USED TO COMPENSATE FOR INCREASED COSTS

46.     UP denies the heading that appears before this paragraph.  UP admits that it entered into private freight transportation contracts after passage of the Staggers Act and that some of those contracts included rate escalation provisions tied to various cost indices.  UP admits that the AII and the RCAF were indices published by the AAR, and that both indices included a factor for fuel costs as well as other factors.  UP denies that the RCAF or the AII captured its actual increases in fuel costs.  UP denies the remaining allegations in this paragraph.

47.     UP denies the allegations in this paragraph.

48.     UP admits that the National Freight Transportation Association ("NFTA") held a meeting in Litchfield Park, Arizona.  UP admits that certain railroad executives attended certain AAR board meetings at which appropriate topics concerning the rail industry were discussed. UP denies the remaining allegations in this paragraph.

49.     UP denies the allegations in this paragraph.

50.     UP admits that the AAR announced the All-Inclusive Index Less Fuel ("AII-LF") in the fall of 2003.  UP admits that the AII-LF is calculated using the same components and methods as the All-Inclusive Index uses for the Rail Cost Adjustment Factor, with the exception of the exclusion of the fuel component.  UP asserts that the AAR's publication speaks for itself.

UP denies that the AAR's announcement of the AII-LF was pursuant to, or the result of, a conspiracy, or that the decision was unlawful collective action.  UP denies the remaining allegations in this paragraph.

51.     UP denies the allegations in this paragraph.

52.     UP denies the allegations in this paragraph.  UP lacks sufficient information to form a belief about the truth of the allegation that the creation of the AII-LF marked the first time that the AAR created a cost escalation index without a fuel cost component.  UP denies the remaining allegations of this paragraph.

53.     UP admits that the AII and the RCAF both included a fuel cost component and that UP used both indices from time to time.  UP denies the remaining allegations in this paragraph.

54.     UP denies the allegations in this paragraph.

55.     UP denies the allegations in this paragraph.

56.     UP lacks sufficient information to form a belief about the truth of the allegations in this paragraph, and on that basis, denies them.

III.     **IMPLEMENTATION OF THE [ALLEGED] SCHEME: [ALLEGEDLY] THE DEFENDANTS CONSPIRE TO ADOPT FUEL SURCHARGES**

57.     UP denies the heading that appears before this paragraph.  UP denies the allegations in this paragraph.

58.     UP lacks sufficient information to form a belief about the truth of the allegations in this paragraph, and on that basis, denies them.

59.     UP denies the allegations in this paragraph.

60.     UP lacks sufficient information to form a belief about the truth of the allegations in this paragraph, and on that basis, denies them.

61.     UP admits that in late 2002 it announced a carload fuel surcharge based upon the WTI index, and that in 2003 it announced a carload fuel surcharge based upon the HDF index. UP denies the remaining allegations of this paragraph.

62.     UP admits that one of UP's carload fuel surcharges applied a surcharge of 0.5 percent for every five-cent increase above $1.35 per gallon in the HDF index, and that this formula resulted in the same percentage surcharge as one of BNSF's published surcharges above a price of $1.35 per gallon in the HDF index.  UP denies the remaining allegations in this paragraph.

63.     UP denies the allegations in this paragraph.

64.     UP denies the allegations in this paragraph.  UP independently and unilaterally determined what fuel surcharges to adopt, and at no time did it enter into an agreement or conspiracy with railroads to implement the same fuel surcharge program in violation of the antitrust law.

65.     UP admits that it announced a change to the calculation of one of its WTI-index based fuel surcharges in 2003 which it did not implement. UP denies the remaining allegations of this paragraph.

66.     UP denies the allegations in this paragraph.

67.     UP lacks sufficient information to form a belief about the truth of the allegations relating to the fuel surcharge percentages charged by BNSF, and on that basis, denies them.  UP admits that in November 2004, UP announced a rate-based fuel surcharge for coal moves.  UP admits that this coal fuel surcharge began at the rate of 1.5% when the HDF index was at $1.35 per gallon, increased 0.5% for each additional increase of $0.05 per gallon up to $1.60 per

gallon, and thereafter increased 0.75% for each additional $0.05 per gallon.  UP denies the remaining allegations in this paragraph.

68.     UP denies the allegations in this paragraph.

69.     UP denies the allegations in this paragraph.

70.     UP denies the allegations in this paragraph.

71.     UP admits that it applied fuel surcharges to some private contracts and other traffic in addition to published tariff rates.  UP denies the remaining allegations of this paragraph.

72.     UP denies the allegations in this paragraph.

73.     UP lacks sufficient information to form a belief about the truth of the allegations relating to the fuel surcharge percentages charged by other defendants, and on that basis, denies them.  UP denies the remaining allegations in this paragraph.

74.     UP lacks sufficient information to form a belief about the truth of the allegations relating to the fuel surcharge percentages charged by other defendants, and on that basis, denies them.  UP denies the remaining allegations in this paragraph.

75.     UP lacks sufficient information to form a belief about the truth of the allegations relating to the fuel surcharge percentages charged by other defendants, and on that basis, denies them.  UP denies the remaining allegations in this paragraph.

76.     UP lacks sufficient information to form a belief about the truth of the allegations relating to the fuel surcharge percentages charged by other defendants, and on that basis, denies them.  UP denies the remaining allegations in this paragraph.

77.     UP denies the allegations in this paragraph.

78.     UP asserts that the cited article in Traffic World speaks for itself.  UP denies the remaining allegations of this paragraph.

79.     UP admits that American Chemistry Council and an entity calling itself Consumers United for Rail Equity issued a purported study of railroad fuel surcharge revenue in 2007.  UP denies that that study accurately analyzed or reported its fuel surcharge revenue or fuel costs.  UP denies the remaining allegations in this paragraph.

80.     UP lacks sufficient information to form a belief about the truth of the allegations concerning other defendants' fuel efficiency, and on that basis denies them.  UP denies the remaining allegations in this paragraph.

81.     UP denies the allegations in this paragraph.

82.     UP denies the allegations in this paragraph.

## IV.     OTHER ELEMENTS OF [ALLEGED] CONSPIRACY

83.     UP denies the heading that appears before this paragraph.  UP denies the allegations in this paragraph.

84.     UP denies the allegations in this paragraph.

85.     UP denies the allegations in this paragraph.

86.     UP denies the allegations in this paragraph.

87.     UP denies the allegations in this paragraph.

88.     UP denies the allegations in this paragraph.

89.     UP denies the allegations in this paragraph.

## V.     ADDITIONAL [ALLEGATIONS OF ] EVIDENCE OF ANTICOMPETITIVE CONDUCT

90.     UP denies the heading that appears before this paragraph.  UP admits that there are seven Class I railroads operating in the United States.  UP further admits that it has incurred

large capital costs in connection with offering rail freight services.  UP also admits that its CEO

is a member of the AAR Board and that the Board meets from time to time.  UP admits that in

1897 the Supreme Court issued a ruling in *United States v. Trans-Missouri Freight Ass'n*, 166

U.S. 290 (1897).  That decision speaks for itself and on that basis, UP denies the Complaint's

characterization of that ruling, which is inappropriate for a complaint and should be stricken.  UP

denies the remaining allegations in this paragraph and its sub-paragraphs.

## VI.    THE STB DECISION

91.    UP admits that it collected fuel surcharges from certain customers as a cost-

recovery mechanism.  UP asserts that the record of the STB proceedings speaks for itself and on

that basis denies Plaintiffs' characterization of the ruling.

92.    UP admits that the STB issued a ruling in January 2007 directed to rate-based rail

fuel surcharges related to regulated traffic.  UP asserts that the ruling speaks for itself and on that

basis denies Plaintiffs' characterization of the ruling, which is inappropriate for a complaint and

should be stricken.  UP denies the remaining allegations in this paragraph.

93.    UP admits that the STB issued a ruling in January 2007 directed to rate-based rail

fuel surcharges related to regulated traffic.  UP asserts that the ruling speaks for itself and on that

basis denies Plaintiffs' characterization of the ruling, which is inappropriate for a complaint and

should be stricken.  UP denies the remaining allegations in this paragraph.

94.    UP admits that the STB issued a ruling in January 2007 directed to rate-based rail

fuel surcharges related to regulated traffic.  UP asserts that the ruling speaks for itself and on that

basis denies Plaintiffs' characterization of the ruling, which is inappropriate for a complaint and

should be stricken.  UP denies the remaining allegations in this paragraph.

95.    UP denies the allegations in this paragraph.

## VII.   DEFENDANTS' [ALLEGED] SUPRA-COMPETITIVE PROFITS

96.     UP denies the heading that appears before this paragraph.  UP admits that

American Chemistry Council and an entity calling itself Consumers United for Rail Equity

issued a purported study of railroad fuel surcharge revenue in 2007.  UP denies that that study

accurately analyzed or reported its fuel surcharge revenue or fuel costs.  UP denies the remaining

allegations in this paragraph.

97.     UP admits that in 2008, Rail Business published an article purportedly reporting

on rail fuel surcharges.  UP asserts that the Rail Business article speaks for itself and on that

basis denies the Complaint's characterization of the article.  UP further denies that the article

accurately analyzed or reported UP's revenues from fuel surcharges or its expenses and fuel

costs.  UP denies the remaining allegations of this paragraph, including the sub-parts.

98.     UP denies the allegations in this paragraph.

99.     UP lacks sufficient information to form a belief about the truth of the allegations

relating to operating revenue of the United States railroad industry and the fuel surcharge

percentages charged by other defendants, and on that basis, denies them.  UP admits that Mr.

Young stated in an interview in 2007 that UP "[t]hree or four years ago [the fuel surcharge

mechanisms] were really nonexistent."  In response to a separate question concerning capital

investment, Mr. Young stated that UP is committed to a high level of capital spending as long as

UP's financial returns continue to improve.  He added that it has only been in the last couple of

years that the financial returns in the rail business have started to move in the right direction.  UP

denies the remaining allegations of this paragraph.

100.    UP admits that in 2008, a putative class action was filed against BNSF, CSX, NS,

and UP alleging price fixing in violation of Section 1 of the Sherman Act as well as violations of

state antitrust and consumer protection law.  UP admits that this Court and the United States

Court of Appeals has issued several rulings and/or opinions in connection with the *In re Rail Freight Fuel Surcharge Antitrust Litigation*, MDL No. 1869.  UP asserts that the rulings and/or opinions speak for themselves and on that basis denies Plaintiffs' characterization of the rulings. UP admits that during the appeal, the defendant railroads stipulated to the Court that the time between the District Court's denial of class certification and the D.C. Circuit's decision would not count toward the limitations period.  This paragraph further states legal conclusions regarding statute of limitations for which no response is necessary.  To the extent a response is deemed required, UP denies the allegations in this paragraph.

## VIII.   DEFENDANTS' [ALLEGED ] ANTI-COMPETITIVE CONDUCT [ALLEGEDLY] HARMED COMMERCE AND THE PUBLIC IN GENERAL

101.    UP denies the heading that appears before this paragraph.  UP denies the allegations in this paragraph.

102.    UP admits that it sells rail transportation services that affect interstate commerce. UP denies that it has engaged in a conspiracy or has co-conspirators.  UP denies the remainder of the allegations in this paragraph

## IX.   [ALLEGEDLY] EACH OF THE PLAINTIFFS SUFFERED INJURY BY VIRTUE OF DEFENDANTS' ANTICOMPETITIVE CONDUCT

103.    UP denies the heading that appears before this paragraph.  UP denies the allegations in this paragraph.

### AK Steel

104.     UP admits that AK Steel purchased certain rail transportation services from UP during the relevant time period.  UP denies the remaining allegations in this paragraph.

105.    UP denies the allegations in this paragraph.

**CF Industries**

106.    UP admits that CF Industries or its subsidiaries purchased certain rail transportation services from UP during the relevant time period.  UP denies the remaining allegations in this paragraph.

107.    UP denies the allegations in this paragraph.

108.    UP admits that Terra or its subsidiaries purchased certain rail transportation services from UP during the relevant time period.  UP denies the remaining allegations in this paragraph.

109.    UP denies the allegations in this paragraph.

**Dairyland**

110.    UP admits that Dairyland purchased certain rail transportation services from UP during the relevant time period.  UP denies the remaining allegations in this paragraph.

111.    UP denies the allegations in this paragraph.

**Dyno Nobel**

112.    UP admits that Dyno Nobel purchased certain rail transportation services from UP during the relevant time period.  UP denies the remaining allegations in this paragraph.

113.    UP denies the allegations in this paragraph.

**Entergy Arkansas**

114.    UP admits that Entergy Arkansas purchased certain rail transportation services from UP during the relevant time period.  UP denies the remaining allegations in this paragraph.

115.    UP denies the allegations in this paragraph.

**Entergy Louisiana**

116.    UP admits that Entergy Louisiana purchased certain rail transportation services from UP during the relevant time period.  UP denies the remaining allegations in this paragraph.

117.    UP denies the allegations in this paragraph.

**Exelon**

118.    UP admits that Exelon purchased certain rail transportation services from UP during the relevant time period.  UP denies the remaining allegations in this paragraph.

119.    UP denies the allegations in this paragraph.

**North Star**

120.    UP admits that North Star purchased certain rail transportation services from UP during the relevant time period.   UP denies the remaining allegations in this paragraph.

121.    UP denies the allegations in this paragraph.

**Steelscape**

122.    UP admits that Steelscape purchased certain rail transportation services from UP during the relevant time period.  UP denies the remaining allegations in this paragraph.

123.    UP denies the allegations in this paragraph.

**WEPCO**

124.    UP admits that WEPCO purchased certain rail transportation services from UP during the relevant time period.  UP denies the remaining allegations in this paragraph.

125.    UP denies the allegations in this paragraph.

## COUNT 1

### [ALLEGED] Price Fixing (Fuel Surcharge) in violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. § 1, 3, and Section 4 of the Clayton Act, 15 U.S.C. § 15
### (By all Plaintiffs against all Defendants)

126.    UP denies the unnumbered heading in the preceding paragraph.  UP incorporates by reference its responses to the preceding numbered paragraphs.

127.    UP denies the allegations in this paragraph.

128.    UP denies the allegations in this paragraph.

129.    UP denies the allegations in this paragraph, including the sub-parts.

130.    UP denies the allegations in this paragraph.

## X.    CONCLUSION AND DEMAND FOR JURY TRIAL

131.    UP denies that Plaintiffs are entitled to any of the relief they seek.

132.    Defendant Union Pacific Railroad Company hereby demands trial by jury on all issues so triable.

### UNION PACIFIC'S AFFIRMATIVE DEFENSES

UP asserts the following defenses without in any way alleging it has the burden of proof with respect to any of the defenses or that the Plaintiffs are relieved of their burden to prove each and every element of their claims and damages, if any, to which Plaintiffs claim they are entitled. The defenses apply to each and every cause of action alleged.

### FIRST AFFIRMATIVE DEFENSE
### (Statute of Limitations)

133.    Plaintiffs' claims are barred in whole or in part by the applicable statute of limitations, including 15 U.S.C. §15b.  Plaintiffs' claims are also barred in whole or in part by limitations on the time for bringing claims specified in particular contracts between Plaintiffs and UP.

## SECOND AFFIRMATIVE DEFENSE
### (Estoppel, Waiver)

134.     Plaintiffs' claims are barred, in whole or in part, by the doctrines of estoppel and

waiver.

## THIRD AFFIRMATIVE DEFENSE
### (10706 Statutory Protections)

135.     Defendants' alleged conduct with respect to communications concerning interline

railroad services and other railroad services was privileged under law, including, but not limited

to, the statutory privileges described in 49 U.S.C. §10706.

## FOURTH AFFIRMATIVE DEFENSE
### (Failure to Mitigate Damages)

136.     Plaintiffs are barred from recovery by reason of their failure to mitigate,

minimize, or avoid the damages alleged in the Complaint.

## FIFTH AFFIRMATIVE DEFENSE
### (Laches)

137.     Plaintiffs' claims are barred by the doctrine of laches.

## SIXTH AFFIRMATIVE DEFENSE
### (Exclusive Jurisdiction)

138.     Plaintiffs' claims are barred under federal laws granting exclusive jurisdiction to

the STB, including 49 U.S.C. §10501, *et seq.*, to the extent those claims are based on conduct

that is subject to the jurisdiction of the STB.

**SEVENTH AFFIRMATIVE DEFENSE**
**(Set-Off)**

139.    Any alleged claim for damages by Plaintiffs are subject to set-off against any

money that Plaintiffs owe to UP for rail services provided by UP.

**EIGHTH AFFIRMATIVE DEFENSE**
**(Standing)**

140.    Plaintiffs lack standing to assert the antitrust claims that they allege.

**NINTH AFFIRMATIVE DEFENSE**
**(Pass-On)**

141.    Plaintiffs' claims are barred in whole or in part by the pass-on defense.

**TENTH AFFIRMATIVE DEFENSE**
**(Implied Preemption)**

142.    Plaintiffs' claims are preempted by virtue of the federal regulatory scheme

governing the provision of rail freight services, including under the filed rate doctrine.

**ELEVENTH AFFIRMATIVE DEFENSE**
**(Unclean Hands)**

143.    Plaintiffs' claims are barred, in whole or in part, by the doctrine of unclean hands.

**TWELFTH AFFIRMATIVE DEFENSE**
**(Failure to State a Claim for Relief)**

144.    Plaintiffs fail to state facts or claims against UP sufficient to state a claim upon

which relief may be granted.

**THIRTEENTH AFFIRMATIVE DEFENSE**
**(Arbitration)**

145.    Plaintiffs' claims against UP are barred, in whole or in part, to the extent that

Plaintiffs agreed to arbitrate claims related to their relevant contracts with UP.

## FOURTEENTH AFFIRMATIVE DEFENSE
## (49 U.S.C. § 11101)

146.    Plaintiffs' claims are barred, in whole or in part, because those claims improperly infer the existence of a conspiracy based on UP's common carrier obligation to disclose rates and provide shippers with advance notice of rate changes pursuant to 49 U.S.C. § 11101.

## FIFTEENTH AFFIRMATIVE DEFENSE

147.    UP incorporates any other affirmative defenses pleaded by other Defendants that do not conflict with UP's affirmative defenses.

## PRAYER FOR RELIEF

WHEREFORE, UP prays for judgment as follows:

1.    That judgment be entered in favor of UP and against Plaintiffs on all their claims;

2.    That Plaintiffs take nothing by their Complaint;

3.    That the Complaint be dismissed with prejudice;

4.    That UP recover all attorneys' fees, costs, and expenses incurred in defense of this action; and,

5.    That the Court grant UP such further relief as the Court deems just and proper.

Dated: December 16, 2019

Respectfully submitted,

 _/s/ John M. Majoras_____
John M. Majoras (DC Bar No. 474267)
Kristen A. Lejnieks (DC Bar No. 502136)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Telephone:     +1.202.879.3939
Facsimile:     +1.213.626.1700
E-mail:   jmmajoras@jonesday.com
E-mail:   kalejnieks@jonesday.com

Tyrone R. Childress (CA Bar No. 136795, *pro hac forthcomin*g)
Erna Mamikonyan (CA Bar No. 302000, *pro hac forthcoming*)
Kelsey S. Bryan (D.C. Bar No. 1034352)
JONES DAY
555 South Flower Street, Fiftieth Floor
Los Angeles, CA  90071-2300
Telephone:     +1.213.489.3939
Facsimile:     +1.213. 243.2589
E-mail:   tchildress@jonesday.com
E-mail:   emamikonyan@jonesday.com
E-mail:   kbryan@jonesday.com

Attorneys for Defendant
UNION PACIFIC RAILROAD COMPANY